*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 12, 2021

Plaintiff-Appellee,

v

No. 351875
Monroe Circuit Court
LC No. 19-245176-FC

JESSICA LYNN MORRIS,

Defendant-Appellant.

Before: RIORDAN, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right her jury-trial convictions for first-degree murder, armed robbery, and unlawful imprisonment. On appeal, defendant argues that she was denied the right to present a defense, her trial counsel was ineffective, multiple witnesses who testified on behalf of the prosecutor invaded the province of the jury, and the prosecutor presented insufficient evidence to support her convictions. In her Standard 4 brief, defendant further argues that her convictions and sentences for first-degree premeditated murder, first-degree felony murder, and armed robbery violated her double-jeopardy protections. We affirm.

## I. BACKGROUND

This case arises from the death of James Wappner, whose body was found just north of the Michigan-Ohio border on December 3, 2018. At trial, the prosecutor presented evidence that Wappner was killed on December 2, 2018, while attempting to sell drugs to defendant and her boyfriend, Raymond Blanchong,[1] inside a vehicle in the parking lot of the Bedford Inn in Monroe County, Michigan. During trial, witness testimony and physical evidence linked both defendant and Blanchong to the crime. Furthermore, the prosecutor introduced evidence intended to prove

---

[1] Blanchong appealed his conviction and sentence in a separate appeal before this same panel. *People v Blanchong*, Docket No. 352578.

that defendant was not merely present when the crime occurred, but rather, actively participated in the events that led to Wappner's death, and later attempted to conceal her actions.

At trial, Matthew Richey testified that he discovered a body near a road just north of the Michigan-Ohio border. Richey called 911, but he did not disturb the body and did not find any money or drugs in the surrounding area. Paramedic Matthew Dunbar arrived at the scene, and determined that the body had no cardiac activity. Dunbar testified that he did not find any money or drugs in the surrounding area. Michigan State Police Trooper Eric Pearson arrived at the scene after Dunbar, and he secured the area. Trooper Pearson testified that he did not move or otherwise disturb the body. Trooper Pearson noted that the deceased individual's pant pockets were turned inside out, but he stated that he did not draw any conclusions from that fact. Trooper Lance Tedora, who arrived at the scene shortly after Trooper Pearson, noticed tire tracks leading from the road to the body. Trooper Tedora did not disturb the body and did not find any money or drugs in the surrounding area. Trooper Jack Taeff brought a police canine to the scene to conduct an article search, but he did not find any money, drugs, or other evidence. Trooper Taeff identified the deceased individual as Wappner by using a mobile fingerprint scanner.

The Lenawee County medical examiner, Dr. Bader Cassin, performed the autopsy on Wappner's body. Dr. Cassin concluded that Wappner had received approximately 20 stab wounds, three of which were fatal. Dr. Cassin also concluded that Wappner suffered "severe blunt force injuries" to the back of his head. Although Dr. Cassin was unable to determine whether more than one knife was used to stab Wappner, he did not rule out that possibility, and he opined that it would not have taken a strong individual to inflict the injuries that caused Wappner's death. According to Dr. Cassin, Wappner died sometime between midnight on December 2, 2018, and dawn on December 3, 2018.

Michigan State Police Detective Sergeant Michael Peterson testified that he investigated Wappner's death. After the discovery of Wappner's body, he visited Wappner's last known residence and spoke with Wappner's girlfriend, Shayla Wright. Upon interviewing Wright, Sergeant Peterson learned that Wappner had two cell phones, one of which he used for the sale of illegal drugs. Sergeant Peterson obtained search warrants for the cell phones and determined that Wappner had received multiple telephone calls from a single phone number on the night of his death. Sergeant Peterson was able to track the location of one of Wappner's cell phones, which led him to Brian Walker, who was in possession of the cell phone and Wappner's vehicle.

Walker's statements led Sergeant Peterson to obtain surveillance video footage from the Bedford Inn, taken on the night of Wappner's death. The video was played for the jury and Sergeant Peterson narrated portions of the footage. According to Sergeant Peterson, the video showed Wappner checking in to a room at the Bedford Inn on the night in question. Approximately seven minutes after Wappner checked in, two individuals arrived in the parking lot in a Chevy Avalanche. The driver of the Chevy Avalanche was a white male with a beard. The video showed Wappner exit the Bedford Inn and enter the Chevy Avalanche on two occasions. On the second occasion, the vehicle began to shake back and forth "as if there [was] a struggle going on inside the vehicle." Shortly after this occurred, the Chevy Avalanche left the parking lot.

Amber Klemper, a resident at the Bedford Inn, testified on behalf of the prosecutor. She was in the parking lot of the Bedford Inn at approximately 11:50 p.m. on the night of Wappner's

death. She observed an altercation occurring in a maroon SUV in the parking lot. According to Klemper, it appeared as if the individual sitting in the passenger seat of the vehicle was hitting the individual sitting in the driver's seat. Klemper stated that the individual in the driver's seat was male but that she could not determine if the individual in the passenger seat was male or female.

Shayla Wright testified that she was dating Wappner before his death, and she admitted that Wappner made money by selling illegal drugs. According to Wright, when Wappner left home about one day before his death, he had between $500 and $600 in cash on his person, as well as "a lot of drugs," including crack cocaine, marijuana, and pills. Wright also testified that she recognized defendant because she had witnessed Wappner sell drugs to defendant and Blanchong on three prior occasions. According to Wright, on two of those occasions, defendant and Blanchong did not have enough money to complete the purchase from Wappner.

Walker also testified on behalf of the prosecutor. Walker stated that he arrived at the Bedford Inn with Wappner at about 10:00 p.m. While on the way to the Bedford Inn, Walker heard Wappner receive about six telephone calls from a woman who wanted to purchase cocaine. Shortly after the two men arrived at the Bedford Inn, Wappner went to the parking lot with a "pretty big bag" of cocaine, intending to sell drugs to the individual who had been calling him. According to Walker, Wappner returned to the room after about 15 minutes, and stated that the individual needed to retrieve money from a nearby ATM. During this conversation, Walker noticed that Wappner had about $200 cash in his pocket. Wappner left the room again but did not return. Walker waited for him until about 2:30 a.m., and then left the motel in Wappner's vehicle.

Sergeant Peterson testified further regarding his investigation into Wappner's death. He determined from cell phone records that the telephone calls Wappner had received on the night of his death were made from a telephone number associated with Blanchong and defendant. One month before Wappner's death, defendant was with Blanchong when he was arrested for an unrelated crime in Toldeo, Ohio, while driving a Chevy Avalanche. As part of the booking procedure, Blanchong gave the police a telephone number—the same telephone number from which Wappner received multiple telephone calls on the night of his death. Sergeant Peterson obtained photographs of Blanchong from his arrest one month before Wappner's death, and those photographs indicated that Blanchong was a white male with a beard.

Sergeant Peterson indicated that, later in December 2018, Blanchong and defendant were arrested in Colorado, while driving a Chevy Avalanche. Sergeant Peterson traveled to Colorado to interview both Blanchong and defendant. During his interview, Blanchong showed Sergeant Peterson bite marks on his arm. Michigan State Police Detective Sergeant Larry Rothman assisted with Blanchong's interview, and he testified that Blanchong showed him bite marks on both his arm and neck. The troopers also interviewed defendant, and a recording of her interview was played for the jury. Sergeant Peterson testified that, in contrast to Blanchong, defendant did not have any visible injuries on her body.

During Sergeant Peterson's testimony, defendant's trial counsel began to ask about statements made by Blanchong during his interview, but the prosecutor objected on the basis of hearsay. After the jury left the courtroom, defendant's trial counsel stated that he intended to elicit testimony from Sergeant Peterson that Blanchong told police that he was protecting himself and defendant. Specifically, defense counsel sought to introduce the following statement made by

Blanchong: "you want to hear my side of the story . . . . I was protecting her. I was protecting myself." Defense counsel argued that this testimony was admissible because Blanchong was an unavailable witness under MRE 804(a)(5), and the statement constituted a statement against interest under MRE 804(b)(3). After a recess, the trial court stated that defense counsel should have addressed the admissibility of Blanchong's statements before trial in a motion in limine. The trial court further indicated, however, that Blanchong's statement did not expose him to criminal liability, and that it was not trustworthy given the context. Therefore, the trial court ruled that the out-of-court statement was not admissible under MRE 804(b)(3), and excluded it from evidence.

After the jury returned, Sergeant Peterson testified that he also obtained surveillance video from the Red Roof Inn in Toledo, Ohio, which showed Blanchong checking in at 1:24 a.m. on December 3, 2018. Surveillance video from the Red Roof Inn was played for the jury, and Sergeant Peterson stated that the video depicted defendant leaving the motel at 11:10 a.m. on December 3, 2018. Sergeant Peterson determined that defendant and Blanchong left the Red Roof Inn and went to a car wash in Toledo, Ohio. Surveillance video from the car wash was played for the jury, and Sergeant Peterson stated that the video depicted Blanchong spraying the inside of the Chevy Avalanche with a power washer and washing the vehicle with "cleaning chemicals" for approximately one hour, while defendant assisted by vacuuming the inside of the vehicle.

After leaving the car wash, defendant and Blanchong traveled to the Quality Inn in Findlay, Ohio. Surveillance video from the Quality Inn was played for the jury, and Sergeant Peterson stated that it depicted defendant and Blanchong arriving at the Quality Inn.[2] Sergeant Peterson also stated that the video showed that the rear passenger-side window of the Chevy Avalanche was broken. After leaving the Quality Inn, defendant and Blanchong traveled to Topeka, Kansas. While there, defendant and Blanchong pawned the cell phone that was used to call Wappner on the night of his death. Sergeant Peterson obtained the cell phone and determined that, between December 2 and December 5, 2018, the individual using the cell phone had searched the internet for "stabbing in Lenawee County area, homicide in Lenawee County, missing persons in Toledo," and court records for both Blanchong and defendant.

Joni Johnson, a forensic scientist at the Michigan State Police forensic laboratory, testified as an expert in crime-scene processing and DNA analysis. Johnson searched Wappner's vehicle but did not find any drugs, money, or weapons. Johnson also searched the Chevy Avalanche, and observed that the rear passenger-side window had been broken. Johnson photographed what appeared to be bloodstains on the driver's seat, behind the driver's seat, behind the front passenger seat, on the back seat, and on the ceiling of the vehicle. Johnson determined that the stains in the vehicle were likely caused by blood, and she sent the samples to the laboratory for DNA analysis.

Amber Smith, another forensic scientist for the Michigan State Police, also testified as an expert in crime-scene processing and DNA analysis. Smith collected and analyzed evidence found in the rooms where defendant and Blanchong were believed to have stayed in the Quality Inn and the Red Roof Inn. Smith collected samples of what appeared to be bloodstains that were found in

---

[2] An employee of the Quality Inn testified that he found a cell phone that had been flushed down a toilet, between December 3 and December 5, 2018. He surrendered that cell phone to police.

those rooms. She testified that she did not find DNA from either defendant or Blanchong in the samples taken from the Red Roof Inn, but that their DNA was present in the samples taken from the Quality Inn. Smith also analyzed the blood samples that Johnson obtained from the Chevy Avalanche. Smith concluded that Wappner's DNA was present in three locations throughout the vehicle.

Rachael Starr, an intelligence analyst at the Michigan Intelligence Operations Center, was qualified as an expert witness in the analysis and mapping of cellular records, and she testified regarding defendant's cell phone records. Starr testified that defendant's cell phone was located near the Bedford Inn on the night of Wappner's death, and that defendant made more than eight calls to Wappner's cell phone between 11:00 p.m. and 11:59 p.m. that night. Defendant's cell phone then moved north and connected to cellular towers near the location where Wappner's body was discovered. The cell phone then connected to cellular towers near the Red Roof Inn in Toledo, Ohio, a car wash in Toledo, and a location near the Quality Inn in Findlay, Ohio. Finally, the cell phone connected to cell towers across various states, demonstrating defendant's flight to Topeka, Kansas. Starr verified that, during this time, defendant's cell phone never made any calls to 911.

Defendant chose to testify on her own behalf. During her testimony, defendant stated that she began dating Blanchong in September 2018. She admitted that they both used cocaine and marijuana, and that she and Blanchong had purchased drugs from Wappner "a handful of times." Defendant also admitted that she and Blanchong had attempted to purchase drugs from Wappner on the night of his death. She stated that, when Wappner entered the back seat of the Chevy Avalanche the first time, Blanchong told Wappner that they needed to retrieve more money to complete the purchase. After a time, Blanchong and defendant returned to the parking lot of the Bedford Inn, and Wappner entered the back seat of the vehicle a second time. Defendant testified that a struggle ensued between Blanchong and Wappner inside the vehicle, and that Blanchong was covered in blood. Defendant stated that she climbed into the driver's seat of the vehicle while the two men were fighting, and that she drove the vehicle away from the scene with both of them in the vehicle. In contrast to Sergeant Rothman, who testified that the Chevy Avalanche was equipped with child locks on the rear doors, defendant testified that the vehicle was unlocked while Wappner was inside it. Finally, defendant admitted that, once Wappner lost consciousness, Blanchong drove to a wooded area and dumped Wappner's body by the side of the road before he and defendant left the state.

Although defendant admitted that she was present when Wappner was killed, she maintained that Blanchong was responsible and that she did not contribute to Wappner's death. Defendant further admitted that she fled Michigan with Blanchong after Wappner was killed, but she claimed that she did so because Blanchong threatened her and her children. Defendant admitted helping Blanchong clean his vehicle at the car wash after Wappner's death, but again claimed that she did so because Blanchong threatened her. Defendant admitted, however, that she wrote a letter expressing her love for Blanchong while incarcerated, which evidence tended to indicate that defendant was not afraid of Blanchong.

After the defense rested, the parties presented closing arguments. In relevant part, defense counsel argued that defendant was merely present when Blanchong killed defendant. At the end of trial, after discussing the jury instructions with counsel in chambers, the trial court asked the parties whether they were satisfied with the instructions. Defendant's trial counsel answered, "The

defense is satisfied." The trial court then read the instructions to the jury, and defendant's trial counsel raised no objections to the instructions as read. Therefore, defendant's trial counsel affirmatively approved the jury instructions read by the trial court.

The jury found defendant guilty of first-degree premeditated murder, MCL 750.316(1)(a), first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, and unlawful imprisonment, MCL 750.349b. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to life imprisonment for first-degree murder, 300 to 600 months in prison for armed robbery, and 120 to 170 months in prison for unlawful imprisonment. The trial court amended the judgment of sentence to reflect that the jury convicted defendant of only one count of first-degree murder, under two alternate theories, and that defendant received one sentence of life imprisonment for first-degree murder.

This appeal followed.

## II. ANALYSIS

### A. RIGHT TO PRESENT A DEFENSE

Defendant first argues that she was denied the right to present a defense, for three reasons: (1) the trial court erroneously excluded testimony concerning Blanchong's statement to the police after his arrest; (2) defendant's trial counsel declined to introduce evidence that defendant had previously been arrested while in possession of a large sum of money; and (3) the "mere presence" instruction, M Crim JI 8.5, should have been read to the jury.

### 1. PRESERVATION AND STANDARDS OF REVIEW

"To preserve an issue for appellate review, a party must object below and specify the same ground for objection that it argues on appeal." *People v Bosca*, 310 Mich App 1, 46; 871 NW2d 307 (2015). Defendant's trial counsel argued during trial that testimony concerning Blanchong's statement to the police was admissible under MRE 804. Therefore, the trial court's ruling that this evidence was inadmissible is preserved for appellate review. This Court reviews de novo both constitutional claims and preliminary questions of law regarding the admissibility of evidence. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). We review a trial court's ultimate decision regarding admissibility of evidence for an abuse of discretion, which occurs when the trial court's decision is outside the range of principled outcomes. *Id.*

At trial, however, defendant's counsel did not address the applicability of M Crim JI 8.5, did not mention evidence concerning defendant's previous arrest, and did not assert that defendant was deprived of the right to present a defense. Because these issues were neither raised before nor decided by the trial court, they are unpreserved for appellate review. See *Bosca*, 310 Mich App at 46. Unpreserved claims of constitutional error are reviewed for plain error affecting a defendant's substantial rights. *People v Brown*, 326 Mich App 185, 192; 926 NW2d 879 (2019). Under a plain-error analysis, "defendant must establish (1) that an error occurred, (2) that the error was plain, and (3) that the plain error affected defendant's substantial rights." *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). An error affects a defendant's substantial rights if it affects the outcome of the lower court proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d

130 (1999). Reversal is warranted only when the plain error "resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Kowalski*, 489 Mich at 506 (cleaned up).

## 2. BLANCHONG'S STATEMENT TO THE POLICE

Defendant argues that the trial court erroneously excluded testimony concerning Blanchong's statement to the police after his arrest, thereby depriving defendant of the right to present a defense. Specifically, defendant argues that the following out-of-court statement made by Blanchong was admissible under MRE 804(b)(3): "you want to hear my side of the story . . . . I was protecting her. I was protecting myself."

"It is well-established that a criminal defendant has a constitutional right to a meaningful opportunity to present a complete defense." *Bosca*, 310 Mich App at 47 (cleaned up). Yet, the "right to present a complete defense may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* (cleaned up). "Thus, an accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* (cleaned up). This includes compliance with the Michigan Rules of Evidence. *Id.*

For an out-of-court statement offered to be admissible under MRE 804(b)(3) to exculpate the accused at a criminal trial, the proponent of the statement must show that the declarant is unavailable to testify, that the statement was against the declarant's penal interest, and that corroborating circumstances support the trustworthiness of the statement. *People v Barrera*, 451 Mich 261, 268; 547 NW2d 280 (1996). A statement is against a declarant's penal interest if, at the time the statement was made, it tended to subject the declarant to civil or criminal liability such that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. MRE 804(3). In determining whether corroborating circumstances support the trustworthiness of a statement made by the declarant while in police custody, this Court considers the following factors: (1) the relationship between the confessing party and the exculpated party; (2) whether the confessing party made a voluntary statement after being advised of his *Miranda* rights; and (3) whether there is any evidence that the statement was made in order to curry favor with the authorities. *Barrera*, 451 Mich at 275.

Assuming without deciding that Blanchong was unavailable to testify under MRE 804(a)(1), we nonetheless conclude that his out-of-court statement was inadmissible and that the trial court properly excluded the statement from evidence. First, Blanchong's statement to the police was not against his penal interest because the statement did not tend to subject Blanchong to criminal liability at the time he made it. Taken in context, Blanchong's statement to the police indicated that he was acting in defense of both himself and defendant when he killed Wappner. "In Michigan, the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." *People v Kurr*, 253 Mich App 317, 320; 654 NW2d 651 (2002) (cleaned up). Further, Michigan law "also allows a person to use deadly force in defense of another." *Id.* Because the bite marks on Blanchong's body supported his claim of self-defense, and Blanchong

asserted that he was acting in defense of both himself and defendant, Blanchong's statement to the police did not tend to subject Blanchong to criminal liability.

Further, corroborating circumstances did not support the trustworthiness of Blanchong's statement. The evidence indicated that defendant and Blanchong were in a romantic relationship when Blanchong made the statement to the police. Thus, he had an incentive to make exculpatory statements on defendant's behalf. Further, Blanchong's statement exculpated both himself and defendant. Because Blanchong's statement was not against his penal interest and corroborating circumstances did not support the trustworthiness of the statement, it was inadmissible, and the exclusion of the statement did not deprive defendant of the right to present a defense.

### 3. DEFENDANT'S PRIOR ARREST

Defendant further argues that she was denied the right to present a defense when her trial counsel declined to introduce evidence that defendant had previously been arrested while in possession of a large sum of money. As explained earlier, we review this unpreserved issue for plain error affecting defendant's substantial rights.

Defendant argues that her trial counsel should have admitted evidence at trial that defendant was arrested, on a prior occasion, while in possession of $38,000. Defendant argues that such evidence would have supported her theory that she did not need to rob or kill Wappner to obtain drugs. We conclude that defendant has not shown that this purported error affected the outcome of her trial, that any error resulted in the conviction of an actually innocent defendant, or that any error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

As explained above, Wright testified that she was familiar with defendant and Blanchong, having witnessed Wappner sell them drugs on three prior occasions. According to Wright, on two of those occasions, defendant and Blanchong did not have enough money to complete the purchase. Wright also testified that Wappner had between $500 and $600 in cash on his person one day before his death, as well as "a lot of drugs." Meanwhile, Walker testified that Wappner had about $200 in cash on his person, along with a "pretty big bag" of cocaine, when he went to meet defendant and Blanchong in the parking lot of the Bedford Inn. Eyewitness testimony and video evidence indicated that Wappner entered the Chevy Avalanche to sell drugs to defendant and Wappner, the vehicle shook with the force of the altercation that occurred inside, and the vehicle drove off with Wappner still inside. When his body was found, no drugs or money were located and his pockets were turned inside out, indicating that defendant and Blanchong had emptied his pockets when they dumped his body at the side of the road. This evidence tended to indicate that Wappner was robbed by defendant and Blanchong.

Evidence that defendant was arrested, on a prior occasion, while in possession of $38,000, did not tend to prove that defendant lacked a motive to participate in a robbery of Wappner on the night in question. In fact, defendant's prior arrest may have prejudiced defendant by leading the jurors to conclude that defendant had a propensity to commit crimes. Further, the admission of the evidence may have caused the jurors to speculate and draw an unfavorable conclusion regarding the origin of the money defendant possessed on that earlier occasion. Additionally, it is unlikely that any benefit defendant would have received from the admission of the evidence would have outweighed the potential prejudicial effect of the evidence. Notably, the fact that defendant

possessed a large sum of money in the past does not mean that defendant possessed a large sum of money at the time of Wappner's death. Accordingly, defendant has failed to establish that plain error occurred when her trial counsel failed to present evidence concerning her prior arrest.

## 4. JURY INSTRUCTIONS

Defendant further argues that she was denied the right to present a defense when the trial court failed to read the "mere presence" instruction, M Crim JI 8.5. As explained earlier, defendant's counsel affirmatively approved the jury instructions. "A defendant waives an issue by expressly approving of the trial court's action," and a "defendant may waive his or her challenge to jury instructions." *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019) (citation omitted). When the trial court asks whether a party has any objections to the jury instructions and the party responds negatively, it is an affirmative approval of the trial court's instructions resulting in waiver of any later challenge to the instructions. *Kowalski*, 489 Mich at 504 n 27. "Waiver extinguishes any error, leaving nothing for this Court to review." *Id*. (citation omitted). Defendant has waived appellate review of this issue, and we therefore decline to address it.

Given our resolution of the above issues, we conclude that defendant was not denied the right to present a defense.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that her trial counsel rendered ineffective assistance. Defendant preserved this issue for appeal by filing a motion to remand with this Court. See *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369); slip op at 6. This Court denied defendant's motion. *People v Morris*, unpublished order of the Court of Appeals, entered December 9, 2020 (Docket No. 351875). Therefore, our review is for errors apparent on the record. *Id*. "Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law." *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016) (citation omitted). A trial court's findings of fact, if any, are reviewed for clear error, while questions of constitutional law are reviewed de novo. *Id*. A trial court's finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014).

A defendant seeking relief based upon a claim of ineffective assistance of counsel bears the burden of showing "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (citation omitted). "A counsel's performance was deficient if it fell below an objective standard of professional reasonableness. The performance prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different." *People v Fyda*, 288 Mich App 446, 450; 793 NW2d 712 (2010). There is a strong presumption that counsel's conduct fell within a wide range of professional assistance. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Thus, defendant must overcome the strong presumption that the challenged action might be considered sound trial strategy. *Id*.

# 1. DEFENDANT'S PRIOR ARREST

Defendant argues that her trial counsel was ineffective by failing to present evidence that she was previously arrested while in possession of a large sum of money. We conclude that trial counsel's performance did not fall below an objective standard of reasonableness. As explained above, evidence concerning defendant's prior arrest may have prejudiced defendant by leading the jurors to conclude that defendant had a propensity to commit crimes, and may have caused the jurors to speculate and draw an unfavorable conclusion regarding the origin of the money defendant possessed. Additionally, it is unlikely that any benefit defendant would have received from the admission of the evidence would have outweighed the potential prejudicial effect of the evidence. For these reasons, trial counsel's performance did not fall below an objective standard of reasonableness, and defendant has failed to overcome the strong presumption that the challenged action might be considered sound trial strategy. Furthermore, the alleged deficiency did not prejudice defendant. Therefore, defendant is not entitled to relief on this issue.

# 2. JURY INSTRUCTIONS

Defendant next argues that her trial counsel was ineffective by failing to request that the trial court include M Crim JI 8.5 in the jury instructions and by failing to object when the trial court did not do so. Assuming without deciding that trial counsel's performance fell below an objective standard of reasonableness in this regard, the omission of M Crim JI 8.5 did not constitute plain error affecting defendant's substantial rights.

"A criminal defendant has the right to have a properly instructed jury consider the evidence" against her. *People v Quinn*, 305 Mich App 484, 493; 853 NW2d 383 (2014) (cleaned up). "The jury instructions must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *People v Armstrong*, 305 Mich App 230, 240; 851 NW2d 856 (2014) (cleaned up).

M Crim JI 8.5 provides: "[e]ven if the defendant knew that the alleged crime was planned or was being committed, the mere fact that [he / she] was present when it was committed is not enough to prove that [he / she] assisted in committing it." M Crim JI 8.5. During her testimony, defendant stated that she was present when Blanchong killed Wappner but maintained that she did not contribute to Wappner's death. Thus, whether defendant was merely present when Wappner was killed was a material issue in this case. For this reason, defense counsel's failure to request the instruction or object to its omission cannot be considered sound trial strategy. Nevertheless, our review of the whole record indicates that this deficiency did not prejudice defendant.

During trial, the prosecutor presented evidence from multiple sources indicating that defendant was not merely present when the crime occurred but that she actively participated in the events that led to Wappner's death. Starr testified that Wappner received multiple telephone calls from defendant's cell phone just before Wappner was killed. Walker testified that he could hear Wappner speaking on the phone with a woman, thereby indicating that Wappner was speaking with defendant rather than Blanchong. Thus, the evidence indicated that defendant arranged for the meeting that ultimately led to Wappner's death. Moreover, Wright testified that defendant and Blanchong did not have enough money to purchase drugs from Wappner on two prior occasions, thereby indicating that defendant and Blanchong may have had a reason to rob Wappner.

Furthermore, Dr. Cassin was unable to rule out the possibility that more than one knife was used to stab Wappner and opined that it would not have taken a strong individual to inflict the injuries that caused Wappner's death. When Wappner's body was found, the money and drugs that were in his possession when he met defendant and Blanchong were missing. Lastly, the prosecutor presented evidence that defendant attempted to conceal evidence relating to her involvement in Wappner's death by helping to clean the interior of Blanchong's vehicle after Wappner's death and by selling her cell phone in Topeka, Kansas. Although defendant claimed that she fled with Blanchong after Wappner was killed because Blanchong threatened her, defendant acknowledged that she wrote a letter expressing her love for Blanchong while incarcerated, thereby indicating that defendant was not afraid of Blanchong.

All of the above evidence tended to indicate that defendant was not merely present when the crime occurred, but rather, actively participated in the events that led to Wappner's death and later attempted to conceal her actions. For these reasons, it was not reasonably probable that, but for trial counsel's failure to request the reading of a mere-presence instruction, the outcome of the proceedings would have differed.

## 3. BLANCHONG'S STATEMENT TO THE POLICE

Defendant also argues that her trial counsel was ineffective because he failed to file a motion in limine seeking to admit the out-of-court statement that Blanchong made to the police.

The record demonstrates that the attempt by defendant's trial counsel to introduce Blanchong's out-of-court statement to the police was not denied simply because counsel failed to raise the issue in a motion in limine. During trial, defendant's counsel argued that the statement was admissible because Blanchong was an unavailable witness, and because the statement constituted a statement against interest under MRE 804(b)(3). Although the trial court admonished defendant's trial counsel for failing to raise the issue in a motion in limine, the trial court ultimately determined that Blanchong's statement was not admissible under MRE 804(b)(3).

Even assuming for the sake of argument that defense counsel's performance was objectively deficient because defense counsel failed to raise the issue in a motion in limine, defendant has failed to establish that she was prejudiced by the purported deficiency. As previously stated, the trial court correctly determined that Blanchong's statement was not admissible under MRE 804(b)(3). Thus, even if defense counsel had raised the issue in a motion in limine, Blanchong's statement would have been inadmissible, and the outcome of the proceedings would not have differed. For these reasons, defendant has failed to establish that her trial counsel was ineffective by failing to address the admissibility of Blanchong's out-of-court statement to the police in a motion in limine.

## 4. SURVEILLANCE VIDEO FOOTAGE

Defendant further argues that Sergeant Peterson's narration of the surveillance video footage played at trial invaded the province of the jury, and that her trial counsel was ineffective for failing to object to the narration testimony. As later discussed in greater detail, Sergeant Peterson invaded the province of the jury by specifically identifying defendant as one of the individuals depicted in the surveillance video footage. Nevertheless, defendant has failed to

overcome the presumption that defense counsel's decision not to object to the sergeant's testimony constituted sound trial strategy. Although his identification testimony bolstered the prosecution's theory regarding defendant's whereabouts on the night of Wappner's death and in the days following Wappner's death, defendant admitted during her own testimony that she was present at each of the locations depicted in the surveillance video footage. Thus, defendant's trial counsel may have declined to object to Sergeant Peterson's identification testimony because the same information would later be elicited from defendant.

Even assuming for the sake of argument that the performance of defendant's trial counsel fell below an objective standard of reasonableness, the failure to object to the sergeant's identification testimony did not affect the outcome of the proceedings. Indeed, the jurors could have determined that defendant was one of the individuals depicted in the surveillance video footage based on Starr's testimony regarding the location of defendant's cell phone at those times or defendant's own testimony that she was present at each location. Accordingly, defendant has failed to establish that defense counsel was ineffective for failing to object to Sergeant Peterson's identification testimony.

## C. INVASION OF PROVINCE OF THE JURY

Defendant next argues that the testimony of witnesses called by the prosecutor invaded the province of the jury and deprived her of a fair trial.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) (citations omitted). During trial, defendant's counsel did not object to Sergeant Peterson's testimony concerning the surveillance video footage on the basis that the testimony invaded the province of the jury, and defendant's counsel did not object when the prosecutor inquired as to the conclusion Trooper Pearson reached when he found Wappner's pockets turned inside out. Thus, this issue is unpreserved, and we review it for plain error affecting the defendant's substantial rights. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011).

MRE 701 permits a lay witness to provide testimony in the form of an opinion if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 701. A witness cannot, however, "express an opinion on the defendant's guilt or innocence of the charged offense." *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) (cleaned up). For this reason, if a witness is in no better position than the jury to identify a defendant in a video or still photograph, the witness's opinion testimony identifying the person is generally inadmissible as an invasion of the province of the jury. *Id*. at 52-53. Conversely, if a witness is in a better position than the jury to identify a defendant in a video or still photograph, the witness's opinion testimony does not invade the province of the jury. *Id*. at 52.

## 1. DETECTIVE SERGEANT PETERSON

Defendant challenges Sergeant Peterson's identification of defendant as an individual in the surveillance video footage as well as his general narration of the events that were depicted. As

explained, we conclude that: (1) a clear and obvious error occurred when Detective Sergeant Peterson identified defendant as one of the individuals depicted in the surveillance video footage; (2) although a clear or obvious error occurred, the error did not affect the outcome of the proceedings; and (3) a clear and obvious error did not occur when Sergeant Peterson narrated the events that took place in the surveillance video footage.

*Identification Testimony.* While Sergeant Peterson was narrating the surveillance video footage, he identified defendant as one of the individuals in the footage. Considering that the videos were played for the jury at trial, there was no indication that Sergeant Peterson had substantial and sustained contact with defendant, and there was no indication that defendant's appearance had changed since the videos were taken, Sergeant Peterson was in no better position than the jury to identify a person in the videos. Thus, his testimony invaded the province of the jury.

Nevertheless, the portions of Sergeant Peterson's testimony that invaded the province of the jury did not affect the outcome of the proceedings. At trial, other evidence was presented concerning defendant's whereabouts following Wappner's death, linking defendant to the crime. Notably, the jurors could have determined that defendant was one of the individuals depicted in the surveillance video footage taken at the Bedford Inn on the night of Wappner's death based on Starr's testimony regarding the location of defendant's cell phone at that time or defendant's own testimony that she was present when Wappner was killed. Further, the jurors could have determined that defendant was one of the individuals depicted in the surveillance video footage taken at the Red Roof Inn, the car wash, and the Quality Inn based on Starr's testimony regarding the location of defendant's cell phone at those times or defendant's own testimony that she was present at each location. For these reasons, plain error did not affect the outcome of the proceedings.

*Narration Testimony.* Defendant further challenges Sergeant Peterson's general narration of the events that were depicted in the surveillance video footage. Defendant does not identify any specific testimony that invaded the province of the jury but generally argues that any narration of the surveillance video footage invaded the province of the jury. Sergeant Peterson's narration testimony was rationally based on his perception of the video and was helpful to provide a clear understanding of the significance of the events that transpired before and after Wappner's death, as well as how the evidence ultimately led to defendant's arrest. Thus, his narration testimony was admissible as lay witness testimony under MRE 701 and did not invade the province of the jury.

## 2. TROOPER PEARSON

During trial, Trooper Pearson testified that Wappner's pant pockets were turned inside out when his body was found. The prosecutor asked whether Trooper Pearson drew any conclusions from that fact, and the trooper stated that he did not. Trooper Pearson did not invade the province of the jury because he did not express an opinion on defendant's guilt or innocence of any charged offense. Indeed, Trooper Pearson's testimony was limited to his perception of Wappner's body on the night it was found, and Trooper Pearson testified that he did not draw any conclusions from the fact that Wappner's pant pockets were turned inside out. In short, there is simply no indication that Trooper Pearson's testimony invaded the province of the jury.

## D. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the prosecutor failed to present sufficient evidence to support her convictions for armed robbery, unlawful imprisonment, first-degree felony murder, and first-degree premeditated murder. Defendant's arguments are unpersuasive.

"This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction," reviewing the evidence "in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution proved the crime's elements beyond a reasonable doubt," *Miller*, 326 Mich App at 735.

## 1. ARMED ROBBERY

Defendant argues that the evidence presented at trial was too speculative to establish that a larceny occurred. To convict a defendant of armed robbery under MCL 750.529, it is necessary to establish the following:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Gibbs*, 299 Mich App 473, 490-491; 830 NW2d 821 (2013) (cleaned up).]

The phrase "in the course of committing a larceny" includes "acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.530(2). Although the armed-robbery statute does not define the term "dangerous weapon," MCL 750.529, knives are generally considered to be dangerous weapons. See *People v Banks*, 454 Mich 469, 473; 563 NW2d 200 (1997).

Although the prosecutor presented little direct evidence establishing that defendant committed a larceny, he presented circumstantial evidence that defendant did so. Walker testified that he was with Wappner at the Bedford Inn on the night of his death. Walker stated that Wappner was in possession of drugs and at least $200 in cash when Wappner went to the parking lot to sell drugs to two individuals. Surveillance video footage and defendant's own testimony revealed that Wappner entered Blanchong's Chevy Avalanche in order to sell drugs to Blanchong and defendant. After Wappner entered the Chevy Avalanche, a struggle ensued, and the Chevy Avalanche could be seen shaking back and forth. After a short period, the Chevy Avalanche was driven out of the Bedford Inn parking lot with Wappner still inside. The following day, Wappner's body was found and it was determined that Wappner died as a result of approximately 20 stab wounds. When Wappner's body was found, Wappner's pockets were turned inside out and Wappner did not have any drugs or cash on his person. Evidence was also presented that defendant

and Blanchong did not have enough money to purchase drugs from Wappner on two prior occasions, thereby indicating that defendant and Blanchong had a reason to rob Wappner. This evidence could have led a rational trier of fact to determine that defendant took the money and drugs from Wappner by force while using a knife. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Carines*, 460 Mich at 757 (cleaned up). The prosecutor presented sufficient evidence to support defendant's conviction for armed robbery.

## 2. UNLAWFUL IMPRISONMENT

Defendant next argues that there was insufficient evidence to support defendant's conviction for unlawful imprisonment because the prosecution failed to prove that Wappner was restrained or secretly confined.

The offense of unlawful imprisonment is set forth in MCL 750.349b as follows:

(1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

> (a) The person is restrained by means of a weapon or dangerous instrument.

> (b) The restrained person was secretly confined.

> (c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony. [See *Bosca*, 310 Mich App at 18, citing MCL 750.349b.]

The term restrain means "to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). Restraint need not occur for any particular length of time. *Bosca*, 310 Mich App at 19. "The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts." *Id*. The term "secretly confined" means either "[t]o keep the confinement of the restrained person a secret[,]" or "[t]o keep the location of the restrained person a secret." MCL 750.349b(4).

> The essence of "secret confinement" as contemplated by the statute is deprivation of the assistance of others by virtue of the victim's inability to communicate his predicament. "Secret confinement" is not predicated solely on the existence or nonexistence of a single factor. Rather, consideration of the totality of the circumstances is required when determining whether the confinement itself or the location of confinement was secret, thereby depriving the victim of the assistance of others. [*Bosca*, 310 Mich App at 19 (cleaned up).]

In this case, the prosecutor presented sufficient evidence to support defendant's conviction for unlawful imprisonment. First, a rational trier of fact could have concluded that defendant knowingly restrained Wappner by means of a weapon. At trial, the prosecutor presented evidence that a struggle ensued after Wappner entered the Chevy Avalanche. When Wappner's body was found the next day, it was determined that he died as a result of approximately 20 stab wounds.

When the Chevy Avalanche was recovered, Wappner's DNA was found inside the vehicle, thereby indicating that Wappner had been stabbed during the struggle inside the vehicle. Evidence was also presented that the Chevy Avalanche was equipped with child locks and that one of the rear windows was broken, thereby indicating that Wappner may have attempted to escape but was unable to do so. Based upon this evidence, a rational trier of fact could have concluded that defendant knowingly restricted Wappner's movements by means of a weapon.

Next, a rational trier of fact could have concluded, based on a totality of the circumstances, that Wappner was secretly confined in the Chevy Avalanche. During trial, Klemper testified that she observed some sort of struggle occurring in the Chevy Avalanche but was unable to determine what exactly transpired inside the vehicle. Evidence was presented that the Chevy Avalanche was equipped with child locks and that one of the rear windows in the Chevy Avalanche was broken, thereby indicating an unsuccessful attempt to escape. Perhaps most notably, defendant admitted that she climbed into the driver's seat of the Chevy Avalanche and drove it out of the Bedford Inn parking lot, with Wappner still inside, shortly after the struggle ensued. Thus, Wappner was unable to communicate his predicament to those outside of the vehicle and was ultimately deprived of the assistance of others. Based upon this evidence, a rational trier of fact could have concluded that Wappner was secretly confined in the Chevy Avalanche.

Lastly, a rational trier of fact could have concluded that Wappner was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony. As previously stated, the prosecutor presented evidence that Wappner was the victim of an armed robbery. Further, defendant and Blanchong fled with Wappner still inside the Chevy Avalanche. Thus, a rational trier of fact could have concluded that Wappner was restrained to facilitate the commission of an armed robbery or to facilitate flight after the commission of an armed robbery.

### 3. FELONY MURDER

Defendant further argues that there was insufficient evidence to support her conviction for first-degree felony murder because there was insufficient evidence to support her convictions for the predicate offenses of armed robbery and unlawful imprisonment.

At the outset, we note that the sole predicate offense for first-degree felony murder in this case was armed robbery. Although the felony information did not specifically list the predicate offense or offenses supporting defendant's conviction for first-degree felony murder, the trial court instructed the jury that the sole predicate offense for first-degree felony murder was armed robbery. Neither party raised any objection to the first-degree felony murder jury instruction. Jurors are presumed to follow their instructions. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). It therefore follows that the sole predicate offense for first-degree felony murder in this case was armed robbery, and the parties' assertions to the contrary lack merit.

Further, defendant challenges only the sufficiency of the evidence supporting the third element of first-degree felony murder. Our analysis will be limited to the scope of defendant's argument. The elements of first-degree felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, and (3) while

committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007). Larceny is a felony specifically enumerated in MCL 750.316(1)(b). MCL 750.316(1)(b). As previously stated, the prosecutor presented sufficient evidence to support defendant's conviction for armed robbery, which requires a finding that a larceny occurred. For this reason, there was sufficient evidence to support defendant's conviction for first-degree felony murder.

## 4. PREMEDITATED MURDER

Defendant further argues that there was insufficient evidence to support her conviction for first-degree premeditated murder. The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation. *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). "Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *Unger*, 278 Mich App at 223. "Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *Id*. at 229. "Some time span between the initial homicidal intent and the ultimate killing is necessary to establish premeditation and deliberation." *Id*. "Circumstantial evidence and reasonable inferences drawn from the evidence may constitute satisfactory proof of premeditation and deliberation." *Id*.

During closing arguments, the prosecutor relied, in part, on an aiding and abetting theory. Generally, to convict a defendant of aiding and abetting a crime, it is necessary to establish that: (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. *Carines*, 460 Mich at 757-758. "An aider and abettor's state of mind may be inferred from all the facts and circumstances." *Id*. at 758. "Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Id*.

A rational trier of fact could have concluded that defendant intentionally killed Wappner or aided and abetted Blanchong in doing so. Defendant admitted that she was present in the vehicle where Wappner appeared to have been killed following a struggle. Although there was no direct evidence establishing that defendant killed Wappner herself, "[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Carines*, 460 Mich at 757 (cleaned up). Further, the fact that Wappner was stabbed approximately 20 times provides circumstantial evidence defendant intended to kill Wappner, either alone or with Blanchong's assistance.

A rational trier of fact could have concluded that defendant killed Wappner with premeditation and deliberation. The parties had a prior relationship in which Wappner sold defendant and Blanchong illegal drugs. Wright testified that, on two prior occasions, defendant and Blanchong did not have enough money to purchase drugs from Wappner, thereby indicating that defendant and Blanchong had a reason to kill Wappner and take his possessions. Additionally,

defendant and Blanchong had attempted to purchase drugs from Wappner earlier that same evening but told Wappner they needed to retrieve more money from a nearby ATM. According to defendant's own testimony, defendant and Blanchong did not retrieve money from an ATM before returning to the Bedford Inn, thereby indicating that defendant and Blanchong planned to take Wappner's possessions. Moreover, after leaving the Bedford Inn, defendant and Blanchong left Wappner's body on the side of the road, attempted to conceal evidence by washing the Chevy Avalanche, and fled to Colorado. The actions of defendant and Blanchong provide further circumstantial evidence of premeditation and deliberation. Based upon the foregoing, there was sufficient evidence to support defendant's conviction for first-degree premeditated murder.

## E. DOUBLE JEOPARDY

Defendant next argues that her convictions violated double-jeopardy protections. To preserve a double jeopardy issue, a defendant must raise the issue at trial. *People v Wilson*, 242 Mich App 350, 359; 619 NW2d 413 (2000). Because defendant failed to raise this issue at trial, it is unpreserved for appellate review. Generally, "[a] double jeopardy challenge presents a question of constitutional law that this Court reviews de novo." *Smith*, 478 Mich at 298. This Court reviews for plain error unpreserved claims that a defendant's double jeopardy rights have been violated. *People v Matuszak*, 263 Mich App 42, 47; 687 NW2d 342 (2004).

### 1. FELONY MURDER AND PREMEDITATED MURDER

In her Standard 4 brief, defendant argues that her convictions and sentences for both first-degree premeditated murder and first-degree felony murder violated double-jeopardy principles. Although we agree that defendant's initial convictions and sentences for both first-degree premeditated murder and first-degree felony murder violated double-jeopardy principles, defendant has already been afforded the proper remedy such that this aspect of the issue is moot.

"The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " *People v Miller*, 498 Mich 13, 17; 869 NW2d 204 (2015), citing US Const, Am V. "The Michigan Constitution similarly provides that '[n]o person shall be subject for the same offense to be twice put in jeopardy.' " *Id.*, citing Const 1963, art 1 § 15.

> The prohibition against double jeopardy protects individuals in three ways: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense. The first two protections comprise the successive prosecutions strand of double jeopardy, while the third protection is known as the multiple punishments strand. [*Id.* (cleaned up).]

This Court has held that "convicting a defendant of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim is a violation of double-jeopardy protection." *People v Orlewicz*, 293 Mich App 96, 112; 809 NW2d 194 (2011). Yet, this Court "will uphold a single conviction for murder based on two alternative theories." *Id.* (citation omitted). "Accordingly, the proper remedy when a defendant is convicted of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single

victim is to modify the conviction to specify that it is for a single count of first-degree murder supported by two theories." *Id*.

In this case, defendant was initially convicted of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim. The trial court, however, amended the judgment of sentence to reflect that defendant was convicted of one count of first-degree murder based on two alternate theories. The amended judgment of sentence also reflected that defendant was sentenced for only one count of first-degree murder. Accordingly, defendant has already been afforded the proper remedy such that this Court cannot fashion any additional remedy, and this aspect of the issue is moot. See *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 386; 803 NW2d 698 (2010).

2. FELONY MURDER AND THE PREDICATE OFFENSE OF ARMED ROBBERY

In her Standard 4 brief, defendant also argues that her convictions and sentences for both first-degree felony murder and the predicate offense of armed robbery violated double jeopardy principles. This argument is without merit.

The double-jeopardy clauses of the United States Constitution, US Const, Am V, and the Michigan Constitution, Const 1963, art 1 § 15, protect a criminal defendant from multiple punishments for the same offense. *Miller*, 498 Mich at 17. Michigan courts apply the same-elements test to determine whether two offenses constitute the same offense for purposes of double jeopardy. *Smith*, 478 Mich at 317. Where both offenses have an element that the other does not, the offenses do not constitute the same offense for purposes of double jeopardy. *Id*. at 296.

In *People v Ream*, 481 Mich 223, 242; 750 NW2d 536 (2008), the Michigan Supreme Court held that convicting and sentencing a defendant for first-degree felony murder and the underlying predicate felony does not necessarily violate double jeopardy. The defendant in *Ream* was convicted of first-degree felony murder and the predicate felony of first-degree criminal sexual conduct. *Id*. at 241. The Court upheld the convictions and the corresponding sentences, reasoning that first-degree felony murder was not the same offense as first-degree criminal sexual conduct for purposes of double jeopardy. *Id*. The Court explained that felony murder "contains an element not included in first-degree criminal sexual conduct, namely, the killing of a human being," and "first-degree criminal sexual conduct contains an element not necessarily included in first-degree felony murder, namely, a sexual penetration." *Id*. The Court further explained that any number of felonies, not just those involving sexual penetration, can support a conviction of felony murder such that the defendant's conviction of the predicate felony did not violate double jeopardy. *Id*. at 241-242.

The Supreme Court has also held that first-degree felony murder is not the same offense as armed robbery. See *Smith*, 478 Mich at 319. In doing so, the Court reasoned that "[f]irst-degree felony murder contains elements not included in armed robbery—namely a homicide and a *mens rea* of malice." *Id*. "Likewise, armed robbery contains elements not necessarily included in first-degree felony murder—namely that the defendant took property from a victim's presence or person while armed with a weapon." *Id*. Because armed robbery and felony murder both require proof of an element that the other does not, and any number of felonies can support a conviction for felony murder, armed robbery and felony murder are not the same offense for purposes of double

jeopardy. Accordingly, plain error did not occur when defendant was sentenced for armed robbery and first-degree murder under two alternate theories, one of which was felony murder.

Affirmed.

/s/Michael J. Riordan
/s/ Jane E. Markey
/s/ Brock A. Swartzle